| | |
|---|---|
| KIMBER EDWARDS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 4:06-CV-1419 (CEJ) |
| | ) |
| DONALD P. ROPER, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on the petition and amended petition of Kimber Edwards for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### I.    Procedural Background

On June 27, 2002, petitioner Kimber Edwards was sentenced to death after a jury in St. Louis County, Missouri, found him guilty of first degree murder and armed criminal action.  The convictions arose from the murder-for-hire shooting by Orthel Wilson[1] of petitioner's ex-wife, Kimberly Cantrell.  Petitioner timely filed a notice of appeal and, on August 23, 2003, the Missouri Supreme Court affirmed his conviction and sentence.  State v. Edwards, 116 S.W.3d 511 (Mo. 2003) (en banc) (Edwards I). The post-conviction court denied petitioner's motion for relief pursuant to Missouri Supreme Court Rule 29.15 after an evidentiary hearing; the Missouri Supreme Court affirmed the denial of relief.  Edwards v. State, 200 S.W.3d 500 (Mo. 2006) (en banc) (Edwards II).  Petitioner timely initiated this proceeding pursuant to 28 U.S.C. § 2254 on September 27, 2006; appointed counsel filed an initial petition on September 25, 2007, and an amended petition on December 17, 2007.

### II.    Factual Background

---

[1]Mr. Wilson's name is variously spelled in the record as "Othel," "Ortell," "Orthell," and "Orthel."  The Court adopts "Orthel," the spelling used in the trial transcript.

## A.    Evidence Presented at Guilt Phase

Concerned family members discovered Kimberly Cantrell's body in her apartment in University City, Missouri, at 9:30 on the evening of August 23, 2000; she had been shot twice in the head at close range.  She was last seen alive leaving her work place at 5:00 p.m. on August 22, 2000.

Ms. Cantrell was embroiled in a protracted dispute with her ex-husband, petitioner Kimber Edwards, regarding child support for their daughter Erica.  In March 2000, petitioner was charged with the class D felony of failing to pay court-ordered child support for a 12-month period.  On August 25, 2000, petitioner was scheduled to appear at a settlement conference where he was expected to accept or reject an offered plea agreement.[2]  Ms. Cantrell was listed as a witness for the prosecution. Petitioner had recently been terminated from his employment as a correctional officer with the City of St. Louis.  He and his wife Jada owned and operated an apartment complex on Palm Street in St. Louis.

University City detectives responded to Ms. Cantrell's apartment on August 23, 2000, where they conducted preliminary interviews with the three women who discovered her body -- her sister Phyllis Cantrell, petitioner's mother Mildred Edwards, and a family friend.  The investigators decided to interview petitioner at his home in the City of St. Louis.  A group of approximately eight police officers from University City and St. Louis arrived at petitioner's home at 3:00 in the morning on August 24th. They informed petitioner that Ms. Cantrell was dead and asked him, his wife Jada, and their three daughters (including Erica)[3] to come to the police station for further

---

[2]The proposed plea agreement required petitioner to make a lump-sum payment of $1,500 and monthly payments of $500.  In exchange, he would receive a suspended imposition of sentence and a five-year term of probation.

[3]Ms. Cantrell had primary physical custody but Erica had been staying with her father and his family for the three weeks prior to her mother's murder.

interviews. Petitioner and Jada traveled in one car; the children in another. At the station, petitioner was placed in an interrogation room, Jada in a secretary's office, and the children in the office of the juvenile officer. Erica was informed that her mother was dead.

Petitioner was questioned about his activities during the preceding several days. He stated that he and his family had been out of town until August 22, 2000. That day, he and Jada took the children to doctors' appointments. While at the medical office, he received a phone call from a tenant regarding a power outage at the rental property on Palm Street. He went to the apartment complex to address the electrical problem. He denied that he had killed his ex-wife and stated that he avoided her as much as possible. Jada was fingerprinted and photographed, and provided a hair sample and ink impression of her shoes. After several hours, officers drove the family home, with the exception of Erica, who left the station with her Aunt Phyllis. An officer completed a petition to remove Erica from petitioner's custody, alleging that he was a suspect in Ms. Cantrell's death.

During the course of the investigation at Ms. Cantrell's apartment, police officers interviewed her next-door neighbors, brothers Christopher and Brandon Harrington. Christopher testified that on the afternoon of August 22nd he heard someone knocking on Ms. Cantrell's front door. He looked out the window and observed a black man carrying a black backpack. The man "banged" on the door for awhile and walked away when there was no answer. Brandon testified that he was watching his favorite television show between 5:00 and 5:30 when he heard a woman's screams and gunshots in the building.

Detectives went to petitioner's rental properties to verify his statement that he had been addressing an electrical problem there on August 22nd. While approaching the apartment complex, the detectives saw a man who matched Christopher

-3-

Harrington's description of the person banging on Kimberly Cantrell's door. The man, who gave his name as Orthel Wilson, stated that he did maintenance work at the rental properties in exchange for free rent. Wilson agreed to return to the police station for further questioning. Photographs of Wilson were placed in a photo line-up and shown to Christopher Harrington who identified Wilson as the man he saw outside Ms. Cantrell's apartment. A search of Wilson's apartment yielded a black backpack containing rubber fingertips.

Wilson was charged with first-degree murder; he then gave a statement implicating petitioner. He also took the police to a vacant building near his apartment, where the police recovered a gun, wrapped in a plastic bag and hidden behind a stack of doors. Forensic tests established that the bullets recovered from Ms. Cantrell's apartment had been fired from the recovered weapon.

On August 26, 2000, David Burke, a police officer in the City of St. Louis and Kimberly Cantrell's cousin, appeared at petitioner's home and began to write tickets for vehicles parked on the grass. Officer Burke testified that petitioner challenged him and knocked the ticket book from his hand. Petitioner was arrested for interfering with an officer and was booked at the City of St. Louis police department.[4] The following day, petitioner was arrested for Ms. Cantrell's murder and was transported to the University City police department.

The University City police told petitioner that Orthel Wilson was in custody and showed him the murder weapon. Petitioner continued to deny any involvement in Ms. Cantrell's murder. However, when officers stated that they were going to reinterview his wife and children, petitioner agreed to make a statement, as long as his family was

---

[4]After petitioner was booked, he was not released but was held overnight on a municipal warrant issued by Beverly Hills, Missouri, for a man named Albert Edwards. It was subsequently determined that petitioner was not the person wanted on the municipal warrant.

left alone. After signing a waiver of his Miranda rights, petitioner stated that he had offered to pay a man named Michael $1,600 to kill Kimberly Cantrell. He said that Michael had overheard him talking about his child support problems and had volunteered to solve his problem for him. The interviewing officers asked whether Michael was really Orthel Wilson; petitioner stated that he was not, but that Wilson had asked why petitioner had not given him the job. Petitioner stated that he had seen Michael and Wilson together and that Wilson demanded money from petitioner, claiming that he had helped in the murder. Petitioner said he told Wilson to get his money from Michael. Petitioner refused to repeat his statements on videotape, but did provide a written statement.

On August 28, 2000, detectives conducted a follow-up interview with petitioner. They told him that his statement differed from Orthel Wilson's in several respects. Petitioner again provided a written waiver of his Miranda rights and stated that he had left out some details in his earlier statement. He stated that Wilson approached him on August 3, 2000, to say that he was working with Michael. Petitioner initially pretended he did not know what Wilson meant, but eventually told Wilson that he would get paid whatever Michael told him he would get paid. He further stated that Wilson left a message on August 24th that the job was done and he wanted to be paid.

Donnell Watson, Orthel Wilson's roommate, testified that he dropped Wilson off in the vicinity of Ms. Cantrell's home at 4:25 p.m. on August 22nd. He also testified that petitioner came to the apartment to speak with Wilson on August 21st, 22nd, and 23rd. Hughie Wilson, Orthel Wilson's brother, testified that he had previously lived in the apartment and that in the spring or summer of 2000 petitioner had talked with him about getting a throwaway gun. In early August, Hughie Wilson testified, he visited his brother in the apartment and that petitioner was there. Hughie noticed a gun on a table in the room. Petitioner told Orthel Wilson to put the gun away.

Petitioner testified during the guilt phase. He denied meeting with Orthel Wilson on August 22nd, 23rd or 24th, and denied that he had any connection to Ms. Cantrell's death. He stated that his confessions were coerced and untrue. The jury found petitioner guilty of first degree murder and armed criminal action.

### B. Penalty Phase

During the penalty phase, the state presented victim-impact testimony from Ms. Cantrell's sister and brother. Petitioner presented nine witnesses who testified that he was a hard worker who loved his family and treated his co-workers and tenants well. Petitioner's mother, Mildred Edwards, testified that petitioner had been close to his father, Emmrie Edwards, with whom he had a good relationship. The witnesses testified that they would be hurt by losing petitioner if he were executed. Petitioner did not testify. The jury found one aggravating circumstance — that he had hired Orthel Wilson and/or a person known as Michael to murder Kimberly Cantrell — and recommended the death sentence, which the trial court subsequently imposed.

### C. Post-Conviction Proceedings

Petitioner's mother testified again at the post-conviction hearing. Contrary to her testimony at trial, Mildred testified that Emmrie Edwards continually beat her throughout the marriage. He prevented her from receiving prenatal care or adequate food during her pregnancies. He was physically abusive to the children as well, waking them up at night to beat them. Unlike his brothers, petitioner would not cry or run away, which caused Emmrie to be more severe with him. When petitioner was an infant he did not cry or respond to external stimulation; as he grew older, he did not crawl or play with toys.[5] He did not show interest in or affection for other family

---

[5]Dr. Cross testified that after trial Mildred Edwards told him that petitioner did not cry when he was born and was totally limp when he was brought to her. Dr. Cross testified that petitioner was in distress when he was born; *i.e.*, he was not breathing and had no heartbeat. (Donald T. Cross Dep. at 42-43, Resp't Ex. F-4.) It is unclear from his testimony whether these observations were made in petitioner's medical

members.  Ms. Edwards' testimony regarding the abuse in the family was supported by that of Tangalayer Mansaw, petitioner's younger cousin who resided with the family during her childhood.  Mrs. Edwards had a record of hospitalizations for treatment of depression during petitioner's childhood.

Petitioner's trial and appellate counsel testified that they found it very difficult to communicate with petitioner.  He demanded that his lawyers pursue irrelevant, time-wasting inquiries,[6] and threatened to withhold exculpatory information unless they satisfied him that they were complying with his demands.  At various times, he asked the court to remove his lawyers.

### D.    Expert Evaluations

Trial counsel sought evaluations from three experts -- John Rabun, M.D., Donald Cross, Ph.D., and Michael Stacy, Ph.D. -- to determine whether petitioner was competent to stand trial and whether he had a mental disease or defect that could provide a defense or significant mitigating evidence.  In completing their evaluations, the experts met with petitioner and his family, conducted testing, and reviewed educational, medical and employment records.  None of the family members told the defense team about petitioner's developmental anomalies or the history of abuse.  The

---

record or whether Dr. Cross inferred this information from Mrs. Edwards' description of what happened during the birth.

[6]Public defender Charles Moreland testified that the prosecutor turned over a statement by a woman who had observed a confrontation between Ms. Cantrell and petitioner many years earlier at a day care center attended by the witness's child and Erica. Mr. Moreland testified that the prosecutor had stated that he would not be using the statement. Petitioner did not believe that Erica was enrolled at the day care center during the time period that the woman mentioned and insisted that his lawyers track down the records from the now-closed day care center in order to establish that the woman was "lying."  He was unable to accept counsels' statement that the witness report would never be admitted and that the issue was irrelevant.  Mr. Moreland testified that he and a defense investigator spent many fruitless hours searching through boxes of records from the day care center in the hopes of regaining their client's cooperation.

defense team put together an outline of significant events in petitioner's life but did not complete a full social history until after trial. Based upon the information available before trial, Dr. Stacy diagnosed petitioner with pervasive developmental disorder, not otherwise specified, with a secondary diagnosis of narcissistic personality disorder. Dr. Cross alerted the defense team that petitioner had a 25-point difference between his verbal and performance IQ scales that was indicative of a developmental disability. Nonetheless, all three experts concluded that petitioner was competent to stand trial and did not have a mental disease or defect that could provide a defense or mitigation evidence.

The post-conviction team obtained a complete social history, which was provided to three experts who testified during the post-conviction proceedings: William S. Logan, M.D., Wanda Draper, Ph.D., and Dr. Cross. Dr. Draper, a developmentalist, reviewed the records and interviewed petitioner and members of his family. Dr. Cross reinterviewed Mildred Edwards, learning for the first time about the family violence and petitioner's lack of attachment. Dr. Logan reviewed the records and interviewed petitioner. After a joint meeting with the legal team, the experts concluded that petitioner showed signs consistent with Asperger's Disorder. This is a developmental disorder in the Autism spectrum that is characterized by impaired social interactions, stereotypies, and repetitive patterns of behavior and interests. Dr. Logan opined that the evidence of the Asperger's Disorder diagnosis could have been offered during the penalty phase to explain petitioner's abnormal demeanor and his inability to reach an amicable agreement with Ms. Cantrell regarding child support and custody issues.

Additional facts will be included below as necessary to resolve the merits of petitioner's claims.

### III.    Grounds for Relief

Petitioner seeks habeas corpus relief on the following grounds:

1. The prosecutor improperly struck venirepersons Laverne Evans and Ronald Burton on the basis of their race, in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

2. Petitioner's Sixth Amendment right to effective assistance of counsel was violated because counsel failed to investigate and present compelling mitigation evidence during the penalty phase.

3. The trial court violated petitioner's right to present mitigation evidence by excluding evidence that petitioner's co-defendant received a life sentence; appellate counsel was ineffective for failing to raise this claim on direct appeal.

4. The death sentence was arbitrarily imposed in violation of the Eighth Amendment because petitioner's more culpable co-defendant received a life sentence.

5. Petitioner's due process rights to a fair trial were violated by the trial court's failure to instruct the jury that no adverse inference could be drawn from his failure to testify during the penalty phase, and by the prosecutor's improper comments on petitioner's failure to testify during the penalty phase.

6. The prosecutor's comments during voir dire and closing arguments infected the trial and penalty phases with unfairness in violation of petitioner's rights to due process and a sentence based on rationality and reason.

7. The trial court violated petitioner's Sixth Amendment right to confront witnesses against him by allowing the prosecutor to introduce out-of-court statements made by petitioner's co-defendant.

8. Petitioner was convicted in violation of his due process rights because he was mentally incompetent to stand trial; trial counsel rendered ineffective assistance of counsel in failing to investigate petitioner's competence to proceed.

9. The trial court violated petitioner's rights under the Fourth, Fifth, and Sixth Amendments by admitting his involuntary and illegally obtained statements.

10. The trial court violated petitioner's due process rights by improperly restricting defense counsel's inquiry into the willingness of venirepersons to consider life imprisonment.

11. Petitioner's conviction and sentence violate his Eighth Amendment rights because his co-defendant made materially false statements; petitioner is actually innocent.

12. The trial court violated petitioner's due process rights by denying his request for a continuance to secure the testimony of a witness to impeach a prosecution witness.

13. The government improperly failed to charge aggravating circumstances in the indictment, in violation of <u>Ring v. Arizona</u>, 536 U.S. 684 (2002).

### IV. Legal Standard

Federal courts may not grant habeas relief on a claim that has been decided on the merits in state court unless that adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d)(1)-(2).

A state court's decision is "contrary to" clearly established law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005). "The state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Brown v. Luebbers, 371 F.3d 458, 461 (8th Cir. 2004) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." Id.

A decision involves an "unreasonable application" of clearly established law if "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner," Payton, 125 S. Ct. at 1439; Williams v. Taylor, 529 U.S. 362, 405 (2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 406. "Federal habeas relief is warranted only when the refusal was 'objectively

unreasonable,' not when it was merely erroneous or incorrect." Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (quoting Williams, 529 U.S. at 410-11).

## IV. Discussion

### Ground 1: Petitioner's *Batson* claim

The prosecutors used peremptory strikes to remove all three African-American members of the venire panel. Petitioner asserts that two of the three[7] -- Laverne Evans and Ronald Burton -- were removed solely on the basis of their race, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

Under Batson, a trial court must engage in a three-step inquiry. Smulls v. Roper, 535 F.3d 853, 859 (8th Cir. 2008). First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Batson, 476 U.S. at 96-97. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Id. at 97-98. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. Rice v. Collins, 546 U.S. 333, 338-39 (2006) (quoting Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (per curiam)). Third, the court must determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 98. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate

---

[7]With respect to the third African-American panel member, the prosecutor stated that "he said he thinks the police lied, believes his nephew was persecuted. . . He also believed the death penalty was not applied equally in our society, could not be part of the system. He has problems with the system." Id. at 913-14. Defense counsel did not counter the prosecutor's argument.

burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Rice, 546 U.S. at 338 (quoting Purkett, 514 U.S. at 768).

The trial court has a pivotal role in evaluating Batson claims: the final step involves an evaluation of the prosecutor's credibility, and the demeanor of both the venire member and the prosecutor may be of great importance. Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008). The trial court "must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." Id. However,

> when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial court, or an appeals court, can imagine a reason that might not have been shown up as false.

Miller-El v. Dretke, 545 U.S. 231, 252 (2005).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), petitioner may obtain relief on a Batson claim only by showing that the Missouri state courts' conclusion is "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. at 240; § 2254(d)(2). The federal court presumes the state courts' factual findings to be sound unless petitioner rebuts "the presumption of correctness by clear and convincing evidence." Williams v. Norris, --- F.3d ---, 2009 WL 2487088 at *10 (8th Cir. Aug. 17, 2009); § 2254(e)(1). "Th[is] standard is demanding but not insatiable; . . . '[d]eference does not by definition preclude relief.'" Miller-El v. Dretke, 545 U.S. at 240 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). A court reviewing a ruling on a Batson challenge must consider all of the circumstances that bear upon the issue of racial animosity. Snyder, 128 S. Ct. at 1208; see also Miller-El v. Dretke, 545 U.S. at 240-

52 (examining the reasons given for striking black jurors in comparison with similarly-situated nonblack jurors); id. at 253-54 (examining prosecutor's use of "shuffling" the jurors when black members were seated at the front of the panel and thus were more likely to serve); id. at 255-60 (detailing the contrasting voir dire questions asked of black and nonblack panel members). With this standard in mind, the Court examines petitioner's claim.

**Laverne Evans**: The prosecutor stated that he struck Ms. Evans because she "mentioned that her niece was treated unfairly by the police, she believed her niece was a victim of the system, that she was only arrested and held in jail because her boyfriend had done something, her niece had done nothing and that it was dropped. When the prosecutors were put to the test of trial, all they did was drop it without any apologies or anything else that she thought she was entitled to. . . Obviously, she seemed to have some distrust of courts and prosecutors, she was talking about going to the city jail and encouraging her niece to just be strong." (Trial Tr. at 914-15, Resp't. Ex. B2).

In response, defense counsel argued that white panel member Kristin Tincu was indistinguishable from Ms. Evans.[8]  Ms. Tincu stated that her nephew received a lengthy sentence for burglary, while a defendant in a vehicular manslaughter case received a shorter sentence. She believed her nephew was treated too harshly and the other defendant too leniently. The prosecutor opined that Ms. Tincu's issue was that the system was "too lenient on somebody." Id. at 915. The trial court overruled the Batson challenge with respect to Ms. Evans.

---

[8]Ms. Tincu was juror number 63. (Supp. Legal File at 20; Resp't. Ex. A-5). Both counsel referred to juror number 62, but the parties agree that Ms. Tincu is the juror defense counsel intended to cite as a similarly-situated white juror.

The statements under consideration arose in response to the prosecutor's question whether the panel members themselves or an immediate family member had ever been prosecuted for a crime. Id. at 752. Ms. Evans responded as follows:

A: I don't know whether you have this information concerning me. My niece was arrested; she was put in jail for three months because her boyfriend was involved in the courtroom where the policeman got shot by his partner because I believe he was selling drugs.

They arrested my niece because she had taken the day off to move and could not account for her whereabouts.

I believe she had let him use her car. When the trial – when it went to trial the young man confessed but they did not say anything else to my niece. They just let her go and my family and I did go down to the jail house to encourage her.

Q: Was this in the City of St. Louis?

A: It was.

Q: Did she have anything to do with our office?

A: It had nothing to do with this – well, I don't know. I think it was the City of St. Louis. I believe it happened on Goodfellow.

    * * *

It was in the City.

Q: That's the City Workhouse. Again, that has nothing to do with our system here. Do you understand that?

A: Yes.

Q: Given that, obviously talking about it even now is emotional; is that right?

A: Not really. I'm nervous. I don't come here often.

Q: Is there anything about the experience with your niece – do you feel she was treated unfairly?

A: She was traumatized by it because we had to get her – we had a psychologist at our church. She had a couple of sessions with him.

Q: We can't address that here, this is not the forum for it. Is there anything about that experience that would prohibit you from giving both sides in this case, even the State of Missouri, a fair and impartial trial?

A:    No, sir.

Id. at 775-77.

Ms. Tincu was the next panel member questioned on this point.

A.    I have a nephew in prison right now.  He's in his fifth year and for burglary.  I also witnessed a vehicular manslaughter case where the guy was convicted of two counts of manslaughter and I guess my problem is that he was let out of prison after seven years and my nephew is still in prison.

It's like a constant thing with my sister.  I have a hard time understanding how the courtroom system works.

Q:    So it sounds like you are upset that your nephew was treated too harshly?

A:    Right.

Q:    Do you feel — were you in a car that was in an accident?

A:    No.  I was a prosecution witness.

Q:    Were you a party?

A:    No.

Q:    You happened to be there and saw something?

A:    Right.

Q:    You found in another case that a person was treated too leniently?

A:    Yeah, for killing two people.

Q:    Compared to your nephew?

A:    For home burglaries.

Q:    Is there anything about the experience that you went through with your nephew and your sister, that's your nephew's mother?

A:    Right.

Q:    That you feel would prohibit you from being fair to both sides in this case?

A:    I'm not a hundred percent sure.  I think I can be.  I just have a real problem with the situation with my nephew and seeing things, you know, he broke into a few houses, he did wrong, here's somebody who kills two people, he's out in seven years.

Q:     Again, I understand you are disturbed about the disparity for treatment for two different trials, one you think is more serious than the other?

A:     Right.

Q:     However, if you are chosen, this is not the forum for you to address disparity, it's the forum to address a specific incident. If it's addressed by the Court based solely on the evidence presented in the court and the instructions of law, would you follow those Court's instructions?

A:     Yes, sir.

Id. at 778-80.

On direct appeal, the Missouri Supreme Court recapped the prosecutor's and defense counsel's arguments with regard to venire members Evans and Tincu. The court then stated: "Moreover, the defense had actually tried to strike Juror Tincu for cause because she had responded to other questions by stating that she might hold it against defendant if he did not testify. She also testified that she had two friends who were carjacked, raped, shot, and left for dead, and she would try but might have difficulty keeping her friends' experience from affecting her view of the case if it also involved a shooting. The trial court was not clearly erroneous in rejecting the Batson challenge as to Juror Evans." Edwards I, 116 S.W.3d at 525.

The Court believes that this is a close case. The prosecutor claimed to find a distinction between Ms. Evans and Ms. Tincu regarding their attitudes toward the "court system." A narrow reading of the transcript could support the conclusion that Ms. Evans did not trust courts to avoid locking up innocent people and Ms. Tincu did not trust courts to engage in proper distribution of punishment of guilty people. By the same token, it would not be unreasonable to conclude that the two women held very similar attitudes about the court system.[9]

_____

[9]The defense team's attempt to strike Ms. Tincu for cause, which the Missouri Supreme Court found to be relevant, has no bearing in the Batson analysis because it was not a reason cited by the prosecutor to distinguish between the two. Miller-El

On the other hand, this case does not present the other indicia of racial bias- -- e.g., panel shuffling, differential questioning, etc. --- that were replete in Miller-El. And, unlike in Snyder, the prosecutor's stated reasons are not flatly inconsistent with the record. Indeed, the outcome may be plausibly attributed to the difference in the demeanor of the two venire members, which a subsequent reading of the transcript cannot recreate. The evaluation of demeanor must be left to the observation of the trial court. The trial court's determination that the strike was race-neutral is not unreasonable in light of the evidence, and petitioner has failed to present clear and convincing evidence sufficient to overcome the presumption of correctness afforded to that determination. Accordingly, petitioner's claim for relief with respect to the strike of Ms. Evans will be denied.

**Ronald Burton**: The prosecutor stated that he struck Ronald Burton because he worked for the postal service and the prosecutor "always struck postal workers." (Trial Tr. at 916-20, Resp't. Ex. B2). The prosecutor believed that a postal worker had once unnecessarily delayed deliberations in a case in which a guilty verdict was ultimately returned. Id. at 917. He opined that postal workers, as employees of "one of the biggest bureaucratic organizations," are "told everyday" that they must follow "so many rules and regulations." He theorized that jury service provides postal workers with an opportunity to "not follow the rules." Id. Defense counsel countered that two other panel members, Daniel Meehan and Thomas Schumacher, also worked

---

v. Dretke, 545 U.S. 231, 252 (2005). ("If the stated reason does not hold up, its pretextual significance does not fade because a trial court, or an appeals court, can imagine a reason that might not have been shown up as false.") On direct appeal, in support of his claim that the stated reason for striking Ms. Evans applied with equal force to Ms. Tincu, petitioner argued that their statements demonstrated that Ms. Tincu "had more problems with the judicial system" than Ms. Evans did. (Appellant's Stmt, at 44, Resp't Ex. C1). Setting aside the validity of this assertion, this argument may account for the Missouri Supreme Court's otherwise unexplained reference to the defense attempt to strike Ms. Tincu for cause.

for bureaucratic organizations.[10]  In response, the prosecutor noted that he had struck two white panel members with connections to "bureaucratic organizations" – Robert Piazza, a white male, worked for Federal Express; Catherine Williams was married to a letter carrier.

In its review of this claim the Missouri Supreme Court cautioned that a strike based upon a prospective jury member's occupation does not, without more, automatically survive a charge of pretext.  Edwards I, 116 S.W.3d at 526.  "In the future, trial courts should . . . consider strikes based on occupation carefully, assessing them for pretext by looking at whether the occupation and the claimed traits relate to the particular case or juror, whether similarly situated jurors are treated differently, and so forth, . . . and not allow a strike to rest solely on the claim that the juror is a 'postal worker.'"  Id. at 528.  Applying its newly announced standard to petitioner's claim, the Supreme Court found that the prosecutor's reason for striking Mr. Burton was not a pretext for discrimination: First, the prosecutor related a prior negative experience with a postal worker on a jury and, second, he struck the two "most similar" prospective jurors.  Id.

Petitioner contests this second rationale, arguing that the prosecutor had reasons other than their association with bureaucratic institutions for striking Ms. Williams and Mr. Piazza; thus, he argues, they were not similarly situated to Mr. Burton.  Ms. Williams testified that her aunt and uncle "were murdered in bed.  The people captured were tried and convicted and executed in the state of Louisiana.  I've seen the devastation of despair on both sides for the victim and the people who committed the crime."  (Tr. 873).  Mr. Piazza indicated that he would not require

---

[10]Mr. Meehan worked for the City of Clayton and Mr. Schumacher worked for the National Archives.  Defense counsel mistakenly identified him as retired military.  The prosecutor was aware that Mr. Schumacher was not former military.  Tr. at 919.

petitioner to present mitigation evidence before he could seriously consider imposing a penalty of life imprisonment. (Tr. 588, 592, 598). It is not obvious to the Court that these statements support petitioner's contention that the prosecutor would have struck panel members Williams and Piazza regardless of their affiliation with bureaucracies. With respect to Mr. Piazza in particular, the cited testimony merely indicates his comprehension of, and willingness to apply, the law during the penalty phase. There is no indication that Mr. Piazza's responses regarding mitigation varied significantly from those jurors selected for service. On this record, the Court cannot say that there is any basis to conclude that the prosecutor's stated reason for striking panel members Williams and Piazza was false. Accepting the prosecutor's reasons as true, Williams and Piazza were similarly situated to Mr. Burton with respect to their employment by bureaucratic institutions.

Petitioner also contends that the County prosecutor's office has a practice of striking black venire members, citing seven decisions in which the Missouri Court of Appeals found a Batson violation. The problem with this argument is that petitioner must show that the selection of the jury in his case was impermissibly influenced by race. Furthermore, the cited cases demonstrate that Missouri's appellate courts are capable of addressing a Batson violation when it occurs.

In a related argument, petitioner contends that since more than 50% of postal workers in St. Louis County are African American, the policy of striking postal workers cannot be race neutral. Batson only requires the prosecutor to offer an explanation that is race neutral on its face. Purkett v. Elem, 514 U.S. 765, 767-78 (1995). The explanation need not be persuasive or even plausible. Id. It is not until the third step that the persuasiveness of the justification becomes relevant. Id. It was not an error for the trial court to accept the prosecutor's justification as facially race neutral. See

Smulls v. Roper, 535 F.3d 853 (8thCir. 2008) (state court did not violate Batson by upholding strike based on venire member's employment as postal worker and demeanor).

The Court may grant petitioner relief on his Batson claim only if it finds that it was unreasonable of the trial court to credit the prosecutor's race-neutral explanation. Rice v. Collins, 546 U.S. 333, 338 (2006). Furthermore, the Court is required to afford a presumption of correctness to the state courts' factual findings. Petitioner has failed to present clear and convincing evidence to overcome that presumption and his claim regarding the strike of venire member Burton must be denied. Petitioner's first claim for relief will be denied.

### Ground 2: Counsel's failure to investigate mitigation evidence

Petitioner contends that trial counsel were ineffective because they failed to conduct an adequate investigation of his social and medical histories. He argues that testimony that he was abused as a child and is diagnosed with Asperger's Disorder would have provided compelling mitigation evidence. This claim was rejected by the post-conviction court, a decision affirmed on appeal by the Missouri Supreme Court. Edwards II, 200 S.W.3d 500 (Mo. 2006).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby. Strickland v. Washington, 466 U.S. 668, 687 (1984). With respect to the first Strickland prong, there exists a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance. Id. at 689. In order to establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In order to obtain relief under § 2254(d)(1), however, it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, petitioner must show that the Missouri courts applied Strickland to the facts of his case in an objectively unreasonable manner. Id.

The post-conviction court and the Missouri Supreme Court both found that a proper investigation was made into petitioner's childhood.

> Counsel interviewed everyone that they were told about by [petitioner] or his family. Although trial counsel were aware of some domestic violence and other problems, they were not aware of the extent. None of the witnesses interviewed went into detail about the extent of Mildred's depression. Not only was this information not disclosed to trial counsel, it was not disclosed to experts who were trained to elicit such information from witnesses. Dr. Cross testified that he did not believe that Mildred was capable of revealing this information during the pretrial period. Trial counsel is not ineffective for not discovering the extent of this evidence, when all reasonable interviews were conducted. This information was not "reasonably available" to trial counsel. Counsel made a reasonable investigation into [petitioner's] background, and nothing in that investigation indicated anything significantly abnormal about [his] childhood.

Edwards II, 200 S.W.3d at 516.

Petitioner claims that trial counsel were ineffective for failing to develop a complete social history and to provide all available records to the experts. The history and records, he argues, would have led the trial experts to determine that he has Asperger's Disorder. This information, if presented to the jury, would have resulted in at least one juror rejecting the death penalty. The Missouri Supreme Court found that, "Although a 'composite' social history was not prepared, . . . trial counsel conducted the interviews that make up the social history and prepared a chronological chart of [petitioner's] life. None of the three pretrial experts requested a more detailed social history." Id. The court further found that "[t]he fact that none of the experts

-21-

asked for more records or a more detailed social history indicates that they did not believe that such information was necessary to a diagnosis." Id. at 518.

Dr. Cross testified that the birth and medical records provided after trial indicated that petitioner was unresponsive at birth. According to Dr. Cross, this evidence supports a finding that petitioner suffered from a significant impairment and should have been provided to the experts before trial. Even without the birth and medical records, however, Dr. Stacy was able to diagnose petitioner as having a pervasive developmental disorder (not otherwise specified). This is a class of five disorders that includes autism and Asperger's Disorder. Despite this very significant diagnosis, however, Dr. Stacy did not identify the condition as presenting significant mitigation opportunities. It is sheer speculation to suggest that narrowing Dr. Stacy's diagnosis to one of the five specific disorders would have altered the pretrial experts' clinical assessment regarding mitigation. It is further speculation to suggest that the diagnosis would have changed the outcome of the penalty phase. Petitioner's contention that counsel improperly ignored Dr. Cross's suggestion that petitioner might have a learning disability suffers from a similar weakness – Dr. Cross did not testify that the diagnosis provided strong mitigation evidence.

Petitioner argues that his case is indistinguishable Rompilla v. Beard, 545 U.S. 374 (2005), in which the Supreme Court found ineffective assistance of trial counsel based on counsel's failure to read the file on Rompilla's prior conviction. The prosecutor placed counsel on notice that the facts of the prior conviction would be used as aggravators in seeking the death penalty. Although the file was easily available to counsel, she neglected to review it before trial. As in this case, Rompilla and his family failed to provide useful mitigation evidence, but the file indicated a history of abuse, retardation, and mental illness. Id. at 390-91. The Supreme Court held that "no

reasonable lawyer" would have failed to examine the readily accessible file in order to investigate the aggravation evidence it contained.  Id. at 389.  The court explicitly differentiated counsel's failure to read the file at hand from "possible searches for school reports [or] juvenile records."  Id.  "Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when the lawyer has reason to doubt there is any needle there."  Id.  In the present case, counsel spent significant time with petitioner and his family, consulted three experts, and reviewed the available records.  Rompilla is distinguishable and does not support petitioner's claim that his counsel's performance was deficient.

Based upon a thorough analysis of the facts and the law, the Missouri Supreme Court concluded that counsel did not provide petitioner with constitutionally ineffective assistance for failing to further investigate petitioner's mental condition.  Petitioner has failed to establish that the state court unreasonably applied Strickland to the facts of this case, and thus cannot establish that he is entitled to relief on this claim.

### Ground 3: Exclusion of evidence regarding Wilson's sentence

Orthel Wilson received a life sentence for his role in Kimberly Cantrell's murder.  The trial court denied petitioner's request to introduce a copy of the sentence and judgment which, he argued, was relevant to the question of mitigation.  Petitioner argues that direct appeal counsel was ineffective for failing to challenge this exclusion as a violation of his Eighth and Fourteenth Amendment rights to present relevant mitigating evidence.

The Strickland standard applies to claims regarding the performance of counsel on direct appeal.  Thus, petitioner must show that his appellate counsel was unreasonably deficient and that his defense was prejudiced by this deficiency; *i.e.*, he must show a reasonable probability that, absent counsel's errors, he would have

prevailed on appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000). When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims. Link v. Luebbers, 469 F.3d 1197, 1205 (8th Cir. 2006). One of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, and counsel will not be held to be ineffective for failing to raise every conceivable issue. Id. (citing Charron v. Gammon, 69 F.3d 851, 858 (8th Cir. 1995)). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith, 528 U.S. at 288 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

The Supreme Court held that the sentencer in a capital case cannot be prevented from considering in mitigation "any aspect of a defendant's character or record and any aspect of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978). In State v. Schneider, 736 S.W.2d 392 (Mo. 1987) (*en banc*), the Missouri Supreme Court determined that exclusion of a co-defendant's plea agreement and sentence did not violate Lockett, because the co-defendant's plea agreement did not pertain to defendant's character or prior record, and the bargain he struck with the prosecutor subsequent to the crime was not relevant to the circumstances of the offense. Id. at 397. Petitioner argues that the holding of Schneider was invalidated by the Supreme Court's ruling in Parker v. Dugger, 498 U.S. 308 (1991).

Parker involved a capital case, in which the jury recommended imposing a life sentence. The trial court rejected the recommendation, finding that there were six statutory aggravating factors and no statutory mitigating factors. Parker, 498 U.S. at 311. The trial court was silent with respect to nonstatutory mitigating factors, but

-24-

stated that "[t]here are no mitigating circumstances that outweigh the aggravating circumstances." Id. On review, the Florida Supreme Court invalidated two of the six aggravating circumstances, but affirmed the death sentence. Id. The issues that developed in federal habeas corpus proceedings and that were presented to the Supreme Court were whether (1) the trial court found that nonstatutory mitigating factors existed and, (2) if so, was the Florida Supreme Court required to reweigh the four aggravating factors against the nonstatutory mitigating factors. The Supreme Court answered both questions in the affirmative and remanded the case with instructions to enter an order directing the State of Florida to reconsider the death sentence. Among the nonstatutory mitigating factors in Parker was the fact that the triggerman received a lesser sentence. Id. at 316.

Petitioner contends that Parker stands for the proposition that a co-defendant's life sentence must be admitted as mitigation evidence. The Missouri Supreme Court rejected this interpretation of Parker, finding that the Supreme Court held that evidence admitted under state law must be considered by the sentencer. Edwards II, 200 S.W.3d at 510. Parker "does not say that an accomplice's sentence is constitutionally required mitigating evidence." Id. (citing decisions of state courts in Texas, North Carolina, and California reaching same conclusion). The court thus rejected petitioner's claim that appellate counsel rendered ineffective assistance in failing to challenge the trial court's exclusion of Orthel Wilson's sentence under Parker.

The decision of the Missouri Supreme Court is not contrary to or an unreasonable application of Parker. See Meyer v. Branker, 506 F.3d 358, 375 (4th Cir. 2007) (Parker does not mandate admission of co-perpetrator's sentence); Dyer v. Calderon, 122 F.3d 720, 742 (9th Cir. 1997) (opinion vacated on rehearing en banc on different grounds) (same). Petitioner's third claim for relief will be denied.

**Ground 4: Wilson's life sentence renders death sentence unconstitutional**

Petitioner contends that it is unconstitutional for him to receive the death penalty when the actual shooter received a life sentence. Petitioner first asserts that his death sentence is arbitrary or disproportionate in violation of the Eighth Amendment. The Eighth Amendment does not require proportionality analysis. Middleton v. Roper, 498 F.3d 812, 821 (8th Cir. 2007) (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984)). However, once a State creates a right to proportionality review, as Missouri has done, then the State may not arbitrarily deny that right to a particular defendant. Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994). In this case, the Supreme Court of Missouri performed the prescribed review and the Constitution does not call for the Court to look behind that review. Middleton, 498 F.3d at 821 (citing Walton v. Arizona, 497 U.S. 639, 656 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584, 589 (2002)). Contrary to petitioner's assertion, the Eighth Amendment does not require proportionality between co-defendants' sentences. United States v. Johnson, 495 F.3d 951, 961 (8th Cir. 2007) (quoting McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987)).

Petitioner also claims that imposing the death sentence upon him when Orthel Wilson received life imprisonment violates the due process and equal protection clauses of the Fourteenth Amendment. These arguments were not presented to the state courts and are procedurally defaulted here. Petitioner contends that ineffective assistance of appellate counsel excuses the default. However, the exhaustion doctrine requires that a claim for ineffective assistance of counsel be initially "presented to the state courts as an independent claim before it may be used to establish cause for a procedural default" in a federal habeas proceeding. Murray v. Carrier, 477 U.S. 478, 489 (1986). Petitioner did not raise this challenge to appellate counsel's performance

in the state court and his due process and equal protection claims cannot be considered here.  See Perry v. Kemna, 356 F.3d 880, 886 (8th Cir. 2004).

### Ground 5: "No Adverse Inference" instruction at penalty phase

Petitioner elected to testify during the guilt phase only.  At the penalty phase, the trial court refused defense counsel's request to instruct the jury that no adverse inference could be drawn from petitioner's failure to testify.[11]  During his closing argument, the prosecutor stated, "What's the one thing we haven't heard about that Kimber Edwards has expressed to anyone, remorse.  Any remorse, any sadness about the killing of Kimberly Cantrell and why haven't you heard it?  Because he obviously hasn't expressed it to anyone." (Tr. at 2031).  Petitioner contends that his Fifth Amendment right to remain silent was violated by the combination of the trial court's refusal to instruct the jury and the prosecutor's comment.

Under the Fifth Amendment, a criminal defendant is entitled to an instruction that the jury may not draw an adverse inference from his exercise of the right to remain silent.  Carter v. Kentucky, 450 U.S. 288 (1981).  On direct review in this case, the Missouri Supreme Court reviewed two prior state court cases addressing the right to the adverse-inference instruction at the penalty phase: State v. Storey, 986 S.W.2d 462 (Mo. 1999) (*en banc*), and  State v. Mayes, 63 S.W.3d 615 (Mo. 2001) (*en banc*).  In Storey, the defendant received a new penalty phase at which he did not testify, nor did the jury hear his original guilt-phase testimony.  Storey, 986 S.W.2d at 464.  On appeal following the second penalty phase, the Missouri Supreme Court held that it

_____

[11]The guilt-phase instruction found in Missouri Approved Instructions-CR3d 308.14 reads: "Under the law, a defendant has the right not to testify.  No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify."  At the penalty phase, defense counsel offered a modification of this instruction that omitted the words "of guilt."  Edwards I, 116 S.W.3d at 539-40.

was error for the trial court to refuse defendant's request for a "no adverse inference" instruction.  Id.  In Mayes, defendant did not testify at either the guilt or the penalty phase.  The jury received the "no adverse inference" instruction at the guilt phase but the trial court refused the instruction at the penalty phase.  The Missouri Supreme Court reversed, holding that the instruction must be given at the penalty phase, even if it was already given at the guilt phase.  Mayes, 63 S.W.3d at 636-37.

In this case, the instruction was not given at the guilt phase because petitioner testified and the trial court refused it at the penalty phase.  The Missouri Supreme Court ruled that the trial court's refusal to give the instruction at the penalty phase was error.  Edwards I, 116 S.W.3d at 540 (where defendant testifies at guilt but not penalty phase of capital case, proper course is to instruct jury that no presumption or inference should be drawn "from the fact that the defendant did not testify in the penalty phase.")  Nonetheless, the court determined that the failure to give the required instruction was harmless beyond a reasonable doubt.  Id. at 541 (citing Chapman v. California, 386 U.S. 18 (1967)).

The court determined that the harmless-error analysis turned on "whether the jury would have expected [petitioner] to also testify in the penalty phase and draw a negative inference from his failure to do so."  Edwards I, 116 S.W.3d at 543.  In Storey, the jury was not told at either phase that it could not consider the defendant's failure to testify.  "In such a case, the jury 'can be expected to notice a defendant's failure to testify, and . . . to speculate about incriminating inferences from a defendant's silence.'"  Id. at 542 (quoting Carter v. Kentucky, 450 U.S. 288, 304 (1981)).  In Mayes, the court properly instructed the jury at the guilt phase but not the penalty phase.  This "might have affirmatively misled the jury into believing it could

consider defendant's silence on the issue of punishment, just not on the issue of guilt." Id.

Petitioner's jury was instructed that it could consider the guilt-phase evidence in deciding punishment. That evidence included petitioner's guilt-phase testimony, in which he stated that he was innocent, his confessions were coerced and false, he had no connection with his ex-wife's death, and he did not hire someone to kill her. The state's evidence during the penalty phase consisted of two witnesses who testified only on the issue of victim impact, while nine defense witnesses testified that petitioner's execution would cause suffering. The Missouri Supreme Court determined that, under the specific circumstances of this trial, there was little more that petitioner could have said during the penalty phase, except to ask for mercy, which his witnesses did on his behalf. The court concluded that the jury would not have expected petitioner to testify again and thus the failure to give the "no adverse inference" instruction was harmless beyond a reasonable doubt. Id. at 543.

The Court cannot say that the Missouri Supreme Court's harmless error analysis was contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also claims that the prosecutor's reference to his lack of remorse was in actuality an improper comment on his failure to testify at the penalty phase. An indirect reference to an accused's decision not to testify is impermissible if it either (1) manifests the prosecutor's intention to call attention to the defendant's failure to testify, or (2) is such that the jury would naturally and necessarily take it as a comment on the defendant's failure to testify. Parkus v. Delo, 33 F.3d 933, 940-41 (8th Cir. 1994). The state supreme court determined that the challenged statement was actually a permissible comment of petitioner's demeanor. This is not an unreasonable determination of the facts in light of the evidence in the record.

Petitioner's fifth ground for relief will be denied.

## Ground 6: Prosecutorial misconduct

Petitioner contends that the prosecutor engaged in multiple acts of misconduct calculated to remove reason and rationality from both the guilt and penalty phases of the trial, in violation of his due process rights and the Eighth Amendment.

At issue is "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. " Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Relief is available only if "the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have sua sponte declared a mistrial." James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999).  To determine if the prosecutor's remarks infected the trial with unfairness, the Court must:

> (1) measure the type of prejudice that arose from the argument; (2) examine what defense counsel did in his argument to minimize prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all the aggravating and mitigating circumstances.

Hall v. Luebbers, 341 F.3d 706, 716 (8th Cir. 2003) (quoting Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir. 1995)).

Petitioner first contends that the prosecutor misstated the burden of proof during voir dire.  During the death qualification voir dire of venire members 11 through 20,[12] the prosecutor stated that, after a finding of guilt, "you go to the second stage and in that stage, the State would have the burden of proving to your satisfaction unanimously that one or more aggravating circumstance exists that makes this crime worse . . ." (Tr. 370) (emphasis added).  On plain error review, the Missouri Supreme

---

[12]The Court notes that petitioner fails to assert that any of the venire members in this group served on the jury, a prerequisite to establishing prejudice.

Court found that the comment was improper but did not affect the outcome of the case because the correct burden of proof was restated multiple times during voir dire and argument and the jury was properly instructed. Edwards I, 116 S.W.3d at 537-38.

During the death qualification of venire members 61 through 70, the prosecutor stated, "The next issue we address is pretrial publicity. This was a case in which there was a contract killing of Mr. Edwards' ex-wife, a woman by the name of Kimberly Cantrell." (Tr. 612). During the death qualification of venire members 71 through 80, the prosecutor similarly asked whether the panel members recalled hearing about "a contract killing of a woman named Kimberly Cantrell." (Tr. 657). Petitioner asserts that these references to "contract killing" were an attempt to tell the jury that an element of the offense had been conceded and had the effect of diminishing the state's burden of proof. The state supreme court rejected this argument, finding that "it was clear that the prosecutor was stating that this was the theory of the case, not that this was a matter the jury could take as given." Edwards I, 116 S.W.3d at 538.

Petitioner also contests the following statements:

> This beautiful child . . . was denied the joy of having her mother seeing her while she is going to high school proms, the joy of having her mother help her plan her wedding, the joy of her mother seeing her daughter grow in [sic] with a family, this child will never have that and this is for three hundred and fifty-one dollars a month.

(Tr. 1881).

> They [Phyllis Cantrell and Mildred Edwards] go over to the apartment together. . . What do they see? They see this terrible [sight], the tragedy Phyllis will never forget and that picture of your sister laying lifeless on the floor.

(Tr. 1885).

> I think you'll find that the State has proven every element that Kimber Edwards acting either with Orthel Wilson and[/]or a person only known as Michael, you know what, I don't think that most people in here believe that Michael actually exists, but that's what's on the written statement that exists, you can consider it, and if you think that Michael really didn't exist, but Orthel acting with him and Kimber together, Kimber is still guilty.

(Tr. 1891-92).

> If a contract killing is not cool reflection then, there is no cool reflection.

(Tr. 1893).

> This is a correctional officer who deals with prisoners in the course of his profession, do you think that he's ever met a person yet who's told him they confessed to a murder to make it easier for his family . . .

(Tr. 1916).

> [H]e said . . . he was in Florida [during the days preceding the murder]. Was anybody offended by that? Here's a guy who hasn't paid child support taking trips to Florida. It's not just a trip, he's looking at a time share to buy into. I guess he'd have money freed up, he wasn't going to have to pay five hundred dollars a month. He was expected to give his ex-wife five hundred dollars a month from the family budget he could be using in the time share in Florida.

(Tr. 1918).

> Penitentiaries in the State of Missouri are filled with people who have been found guilty beyond a reasonable doubt.

(Tr. 1920-21).

> There is nothing more cowardly than hiring somebody else to do your dirty work for you. . .

(Tr. 2034).

> This wasn't a dispassionate [sic] man living on the street, he didn't have to kill to survive, this man takes trips to Florida, fixes up property, living a very normal middle class existence. . .

(Tr. 2039).

> [I]n life people are called upon to make difficult decisions . . . that are joyless but must be done. . . [I]f you vote a verdict of death . . . you have nothing to feel guilty about.

(Tr. 2046).

Assuming without deciding that the prosecutor's comments amount to misconduct, and after considering the relevant factors, the Court concludes that the statements, considered separately and for their cumulative effect, did not so infect the

trial with unfairness as to deprive petitioner of due process; nor were the statements so inflammatory as to remove reason and rationality from the deliberations. Petitioner's sixth ground for relief will be denied.

### Ground 7: Admission of Orthel Wilson's out-of-court statements

Orthel Wilson did not testify at trial. Petitioner contends that the prosecutor was allowed to introduce Wilson's statements and actions through other witnesses without requiring his credibility to be tested through cross-examination. Petitioner claims the admission of this evidence violated his Sixth Amendment right to confront witnesses against him.

The prosecutor introduced evidence regarding police interactions with Orthel Wilson through the testimony of Sergeant Carl Coleman and Detective Joseph Siscel. Sergeant Coleman testified that he encountered Orthel Wilson, who "looked remarkably similar to the person" described by Christopher Harrington. (Tr. 1268). Coleman spoke with Wilson, entered his apartment, and seized a black backpack and clothing; Coleman stated that the seized items matched Christopher Harrington's description. Id. at 1269-70, 1272, 1275. Detective Siscel testified that he spoke to Orthel Wilson. The prosecutor then asked: "Without telling us what he told you, after you had a conversation with Orthel Wilson, did you go anywhere with him?" Siscel answered: "We went to a location in St. Louis City and recovered a handgun." (Tr. 1342). Siscel then identified photographs of a vacant building near Palm Street in St. Louis. When asked by the prosecutor why he had gone to the building, Siscel answered: "Mr. Wilson told us that's where he hid the murder weapon." Trial counsel objected on the basis of hearsay; the prosecutor responded that the statement was not offered for the truth of the matter asserted but to explain why Detective Siscel went to this location. The objection was overruled. (Tr. 1343-44). Although Wilson's

actual statements implicating petitioner were not introduced at all, Edwards I, 116 S.W.3d at 532, Edwards II, 200 S.W.3d at 512, petitioner complains that the testimony "pointed the finger" at him without giving him the opportunity to cross-examine Wilson.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. This right is implicated whenever a statement by an unavailable declarant is introduced into evidence at trial and the defendant has not had an opportunity to cross-examine the declarant. Bobadilla v. Carlson, --- F.3d ---, 2009 WL 2392182 (8th Cir. Aug. 6, 2009). At the time of petitioner's trial, the admission of such evidence was governed by the standard set forth in Ohio v. Roberts, 448 U.S. 56 (1980). Under Roberts, the admission of such statements did not violate the Confrontation Clause so long as the evidence bore "indicia of reliability" by falling within a firmly rooted hearsay exception" or showing "particularized guarantees of trustworthiness." Bobadilla at *1 (citing Roberts). The Supreme Court abandoned the Roberts test in Crawford v. Washington, 541 U.S. 36 (2004), holding that a Confrontation Clause violation exists whenever a "testimonial" statement is admitted against a defendant, regardless of its reliability, when the defendant has had no opportunity to cross-examine the declarant. Id. at 68-69.

The new standard announced in Crawford was applied to petitioner's claim on appeal of the denial of post-conviction relief. Edwards II, 200 S.W.3d at 511-12. As the Missouri Supreme Court noted, the trial court and counsel were "very concerned about avoiding" the admission of improper statements. To that end, the witnesses were directed not to repeat any statements Wilson made, "and on the few occasions when they spoke more directly about what Mr. Wilson told them, nothing they said

suggested that defendant was guilty." Id. at 532-33. The Missouri Supreme Court determined that the trial court did not commit error because the challenged evidence was admitted to explain how the police found the murder weapon. Id. "Hearsay testimony is admissible to explain subsequent [police] conduct." Id. at 533.

The Missouri Supreme Court's decision is not contrary to, or an unreasonable application of, Crawford. The United States Supreme Court reiterated in Crawford that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. 541 U.S. at 59, n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985) (no Confrontation Clause violation where co-defendant's out-of-court confession was admitted for purposes of rebuttal only and thus was not hearsay)). Here, the challenged testimony was admitted for the purpose of explaining subsequent police actions rather than for the truth of the matter and the Confrontation Clause was not implicated. Edwards II, 200 S.W.3d at 512. Petitioner's seventh ground for relief will be denied.

### Ground 8: Petitioner's competence to stand trial

Petitioner contends that he was incompetent to stand trial and that trial counsel were ineffective for failing to investigate and present evidence of his incompetence. This claim was rejected by the Missouri Supreme Court on appeal of the denial of post-conviction relief.[13]

A criminal defendant must be mentally competent to stand trial. Drope v. Missouri, 420 U.S. 162 (1975). Competence is defined as the ability to consult with counsel with a reasonable degree of rational understanding and possessing a rational and factual understanding of the proceedings against him. Dusky v. United States,

_____

[13]Petitioner's related claim that he is presently incompetent was previously addressed. See Doc. #56.

362 U.S. 402 (1960) (*per curiam*). See also Mo.Rev.Stat. § 552.020.1. ("No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures.")  A defendant is presumed to be competent and bears the burden of proving he is incompetent.  State v. Anderson, 79 S.W.3d 410, 432-33 (Mo. 2002) (*en banc*).  A state court determination that a defendant is competent to stand trial is a factual finding entitled to the presumption of correctness.  Lyons v. Luebbers, 403 F.3d 585, 593 (8th Cir. 2005).

The basis for petitioner's claim that he was incompetent at trial is his post-trial diagnosis with Asperger's Disorder.  He claims that counsel should have ascertained this condition before trial.  Had this occurred, he claims, the trial court would have found him incompetent to assist his counsel.  However, at the post-conviction stage, the court rejected any claim that petitioner had been unable to assist counsel based upon its own observations of petitioner in regular interaction with his lawyers throughout the pretrial and trial proceedings.  See Edwards II, 200 S.W.3d at 520 (court noted no difficulty in communication between petitioner and counsel; petitioner's testimony responsive to questions asked).

On review, the Missouri Supreme Court stated, "The record reflects that many of the communication problems were caused by Edwards' desire to control the defense. . . This demonstrates that Edwards was capable of cooperating with his counsel when he chose to do so.  While [his] behaviors may have been frustrating to counsel, and certainly were not always beneficial to Edwards' defense, they were not necessarily irrational or the result of mental incompetence."

Petitioner has not overcome the presumption of correctness with respect to the state court findings that he was competent to assist his counsel. Speculation that a different investigation strategy would have led to a finding of incompetence is insufficient to establish prejudice under Strickland. Petitioner's eighth claim for relief will be denied.

### Ground 9: Admission of petitioner's confessions

As detailed above, petitioner gave two statements to the police after executing written waivers of his Miranda rights. Both statements were introduced at trial. Petitioner challenges the propriety of admitting the statements on two grounds. First, he contends that his statements were taken in violation of his invocation of his rights to remain silent and to have counsel present; second, he asserts that the statements were the product of coercive police tactics.

Petitioner and his family were taken to the police station on August 24, 2000. At that time, Jada consented to give a hair sample and an impression of her shoe. Petitioner and his family left the police station without being charged. Petitioner was arrested on August 26th and gave statements on August 27 and 28, 2000, after police officers told him that they would re-interview Jada and the children. Petitioner sought to suppress the statements, alleging that they were coerced by the threat to question his family. The trial court refused to suppress petitioner's statements, finding that he had failed to establish that they were the product of coercion.

At trial, petitioner made the following offer of proof with respect to his suppression claim: on August 25th, petitioner and his wife consulted a lawyer; they then drafted a letter in which they stated that they wished to invoke their rights to remain silent and to have counsel present during any questioning. That letter was faxed to the University City police department on August 26th; petitioner also read the

letter over the phone to Sergeant Coleman.  He further testified that when he was returned to the police station on August 27, 2000, he invoked his right to counsel.  (Tr. 1843).  He denied that he signed the two waivers of Miranda rights and testified that he wrote only one of the two statements.  (Tr. 1844-45).  The trial court denied petitioner's renewed motion to suppress but ruled that petitioner would be allowed to introduce the letter and the proof that it was faxed to the police department.  (Tr. 1849-50).  During his testimony before the jury, however, petitioner did not refer to or offer the faxed statement.

The United States Supreme Court determined in Miranda v. Arizona, 384 U.S. 486 (1966), that "the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney."  Edwards v. Arizona, 451 U.S. 477, 481-82 (1981).  Once an accused indicates that he wishes to remain silent, interrogation must cease; similarly, if he requests counsel, the interrogation must cease until counsel is present. Id.  When a defendant invokes his right to remain silent, officers must scrupulously honor that right.  Michigan v. Mosley, 423 U.S. 96, 102-04 (1975).

Petitioner contends that he invoked his rights under Miranda when he faxed a letter to the University City police station.  As a result, he argues, his subsequent statements were inadmissible at trial.  The state supreme court rejected this argument because the attempted invocation occurred before petitioner was in custody, Edwards I, 116 S.W.3d at 531-32, a factual determination that petitioner concedes.  First Am. Pet. at 60 [Doc. #21].

> [The U.S. Supreme Court has] never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation" . . . If the Miranda right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior

> to arrest, or indeed even prior to identification as a suspect. Most rights must
> be asserted when the government seeks to take the action they protect against.
> The fact that we have allowed the Miranda right to counsel, once asserted, to
> be effective with respect to future custodial interrogation does not necessarily
> mean that we will allow it to be asserted initially outside the context of custodial
> interrogation, with similar future effect.

McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991). Petitioner's faxed letter had no

legal effect on the propriety of his subsequent interrogation, waiver of his Miranda

rights, or the admissibility of his statements.

Petitioner also contends that he orally reinvoked his right to counsel once he was

arrested. The state supreme court rejected this claim as unsupported by any evidence

in the record. Petitioner has failed to overcome the presumption of correctness

afforded to this factual determination.

Petitioner also contends that his statements were the product of psychological

coercion and thus were involuntary. To determine whether a confession was

voluntary, the court looks at the totality of the circumstances and must determine

whether the individual's will was overborne. United States v. Syslo, 303 F.3d 860, 866

(8th Cir. 2002). Petitioner asserts the following actions by the police created a coercive

atmosphere: the police informed him that Orthel Wilson was in custody; they paraded

Orthel Wilson before him; they showed him the murder weapon; and they told

petitioner they would bring his wife and children back to the police station. Petitioner

asserts that these events, in combination with his Asperger's Disorder, caused him to

feel out of control and to falsely confess in order to secure his family's freedom.

A defendant's mental condition alone is not enough to render a confession

constitutionally involuntary; there must also be coercive police activity. LaRette

v.Delo, 44 F.3d 681, 688-89 (8th Cir. 1995). The trial court found, and the state

supreme court affirmed, that the police actions were not coercive. Edwards I, 116

S.W.3d at 530-31. Petitioner has failed to establish that this finding is an unreasonable determination of the facts. His ninth claim for relief will be denied.

### Ground 10: Restricted voir dire

The trial court sustained the prosecutor's objection to the following voir dire question: "It is the state's theory that Kimber Edwards and another killed his ex-wife, the mother of his child. If the State proves its theory beyond a reasonable doubt, will you be able to seriously consider life without the possibility of parole?" (Tr. 344). The prosecutor objected that the question got "into the specifics of the case. . . [W]e are supposed to be dealing with . . . hypotheticals." Id. The court ruled that defense counsel was allowed to ask whether the panel members could consider a life sentence if the evidence established that this was a contract killing but could not inform the panel that Ms. Cantrell was the mother of petitioner's child. Id. at 346. During general voir dire, defense counsel was allowed to ask whether any panel members had been through a divorce, custody and child support determinations, or proceedings over visitation schedules.

Petitioner relies on Morgan v. Illinois, 504 U.S. 719 (1992) to support his claim that he had a constitutional right to ask the panel members about their ability to consider a life sentence if it were established that the victim was the mother of his child. In Morgan, the Supreme Court stated:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

Id. at 729.

Defense counsel asked panel members whether, assuming a finding of guilt, they would be able to seriously consider a life sentence.  That is what <u>Morgan</u> requires.  Petitioner contends that he was entitled to ask more specific questions so that he could make intelligent use of his peremptory challenges.  But, under <u>Morgan</u>, what is at issue is the "petitioner's ability to exercise intelligently his complementary <u>challenge for cause</u> against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt.  Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered . . . nugatory and meaningless."  <u>Id.</u> at 734 (emphasis added).  Petitioner has failed to establish that he had a constitutional right to ask the excluded question.  His tenth ground for relief will be denied.

### Ground 11: Orthel Wilson gave false testimony

This claim is based upon petitioner's assertion that "post-conviction counsel received information that  Mr. Wilson had recanted his confession."  (First Am. Pet. at 70) [Doc. #21].  This bare assertion, unsupported by any evidence, is insufficient to warrant habeas relief.  As for petitioner's contention that Wilson's recantation would support a claim that he is actually innocent, free-standing claims of actual innocence are not cognizable under § 2254.  <u>Burton v. Dormire</u>, 295 F.3d 839, 848 (8th Cir. 2002).  Finally, petitioner's claim that his conviction was obtained by virtue of Wilson's perjured testimony fails because Wilson did not testify and thus did not commit perjury.  Petitioner's eleventh claim for relief will be denied.

### Ground 12: Denial of continuance to secure impeachment witness

The day before trial, defense counsel sought a continuance in order to seek numerous witnesses, including Robert Smith.  At a hearing on the motion, counsel

represented that Smith would be helpful to impeach Donnell Watson's testimony that petitioner had "surreptitious and quiet meetings" with Orthel Wilson.[14]  Tr. at 211. Trial counsel stated that a continuance was necessary because the defense investigator had been unable to locate Smith for service. When asked why counsel believed that he would be able to locate him if granted a continuance, counsel replied only that he believed Smith still lived in St. Louis.  The trial court denied the continuance, stating it seemed that it seemed unlikely that the witness would be served, but noted that the defense team could continue to search for him.

Robert Smith testified at petitioner's motion for a new trial.  He stated that he was at the apartment complex on August 22, 2000, and observed petitioner walking around the outside of the buildings but never saw him enter the buildings.  (Tr. at 2063).  This testimony, petitioner contends, would have impeached Donnell Watson's testimony that he saw petitioner go into the building to Orthel Wilson's apartment.

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel."  Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (citing Avery v. Alabama, 308 U.S. 444, 446 (1940)).  "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  Id. at 589-90.

---

[14]The continuance motion also identified Terrence McGraw as having similar impeachment evidence.  Mr. McGraw testified at the penalty phase, but did not offer any evidence bearing on Donnell Watson's testimony.  There is no indication that he was unavailable to appear at the guilt phase to present impeachment testimony.

The state supreme court determined that the trial court did not abuse its discretion in denying the motion for continuance because trial counsel offered no basis to conclude that future efforts to locate the witness would be more successful. Edwards I, 116 S.W.3d at 535-36. Furthermore, even if the court erred in denying the continuance, petitioner was not prejudiced. "[O]ther testimony put [petitioner] at the apartments after 9:00 p.m., [on August 22nd] and Mr. Smith could not say that [petitioner] had never talked to Mr. Wilson that night, just that he had not entered the latter's apartment while Mr. Smith was on his porch between 8:00 and 9:00 p.m. . . This testimony would have had limited impeachment value and would not have changed the outcome of the trial." Id. at 536.

The conclusion of the state court is not an unreasonable determination of the facts in light of the evidence, § 2254(d)(2), and petitioner is not entitled to relief on this claim.

### Claim 13: Failure to charge statutory aggravating circumstances

Petitioner contends that the failure of the prosecution to include statutory aggravating factors in the indictment violated his Sixth Amendment right to a jury determination of all facts that increase his punishment. Petitioner bases this argument on Ring v. Arizona, 536 U.S. 584 (2002).

In Ring, the United States Supreme Court held that Arizona's capital murder statute violated the Sixth Amendment. The statute directed that, after a jury determination of guilt on a capital murder charge, the trial judge, sitting alone, was to determine the presence or absence of aggravating factors. Id. at 592. The United States Supreme Court held that the aggravating factors must be found by a jury because they increased the maximum punishment permitted by the guilty verdict. Id. at 609. Petitioner concedes, as he must, that the question of aggravating factors was

-43-

submitted to and decided by the jury in his case. He cannot establish that his Sixth Amendment rights under Ring were violated. Petitioner's thirteenth ground for relief will be denied.

In summary, petitioner has failed to establish that the state courts' decisions on his claims were contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in State court proceedings. 28 U.S.C. § 2254(d).

Accordingly,

**IT IS HEREBY ORDERED** that the petition and the amended petition of Kimber Edwards for a writ of habeas corpus [Docs. #1, #15, and #21] are **denied**.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2009.

-44-